UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

_____

| | |
|---|---|
| ALAN VANBUSKIRK, | 1st AMENDED COMPLAINT WITH DEMAND FOR JURY TRIAL |
| Plaintiff, | |
| v. | Case No. 1:14-CV-07554 MDL No. 2545 |
| AbbVie Inc., Abbott Laboratories, Inc., and Auxilium Pharmaceuticals Inc. Defendants. | In Re: Testosterone Therapy Replacement Products |

_____

COMPLAINT

Plaintiff, A l a n  V a n b u s k i r k , by and through the undersigned counsel, through this Complaint hereby alleges against AbbVie Inc., Abbott Laboratories, Inc., and Auxilium Pharmaceuticals Inc. (hereafter referred to as the defendants) the following:

INTRODUCTION

1.     Plaintiff consumed Androgel and Testim (hereafter referred to as testosterone products) testosterone medication manufactured by the defendants.  AndroGel, which is manufactured, sold, distributed and promoted by AbbVie Inc. and Abbott Laboratories.  Testim is manufactured, distributed and sold by defendant Auxilium.

2.     Defendants misrepresented that testosterone therapy products AndroGel and Testim are both a safe and effective treatment for hypogonadism or "low testosterone," when in fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thrombolytic events.

3.      Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for both AndroGel and Testim. Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low T."

4.      According to the industry·leading Androgen Deficiency in Adult Males ("ADAM") or "Is it Low T?" quiz, the symptoms of "Low T" include being "sad or grumpy", "experiencing deterioration in the ability to play sports" and "falling asleep after dinner." Available at: *http.isitlowt.com/do-you-have-low-low-t- quiz*. Most doctors agree that these symptoms can be caused by an abundance of factors, the most prominent of which is the natural aging process. As a result of this "disease mongering," as termed by Dr. Adriene Fugh·Berman of Georgetown University Medical Center, individuals diagnosed with Low T has increased exponentially. This has directly related to AndroGel's sales increasing to over $1.37 billion per year.

5.      However, consumers of testosterone therapy products were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thrombolytic events.

PARTIES

6.      Plaintiff Alan Vanbuskirk ("Plaintiff") is a resident of Loveland, State of Ohio and a citizen of Ohio.

7.      Defendant AbbVie, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

8.      Defendant Abbott Laboratories, Inc. is a corporation organized and existing under the laws of the state of Illinois and maintains its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.

9.      Defendant Auxilium Pharmaceuticals, Inc. is a Delaware corporation which

has its principal place of business at 640 Lee Road, Chesterbrook, Pennsylvania 19087.

10.     Defendants AbbVie, Inc., Abbott Laboratories, Inc. and Auxilium Pharmaceuticals shall be referred to herein individually by name or jointly as "Defendants".

11.     By way of background, Unimed Pharmaceuticals Inc. originally developed AndroGel and sought FDA approval in 1999. Before the drug was approved by the FDA in 2000, Solvay Pharmaceuticals Inc. acquired Unimed Pharmaceuticals, Inc. and subsequently brought AndroGel to market. In 2010, Defendant Abbott Laboratories, Inc. acquired Solvay's pharmaceutical division, which included AndroGel. Then, in 2013, Abbott created AbbVie, a company composed of Abbott's former proprietary pharmaceutical business, which included AndroGel.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $150,000.00, exclusive of interest and costs, and because complete diversity exists between the parties, as Plaintiff is a citizen of Maine, which is different from the states where Defendants are incorporated and have their principal places of business.

13.     This Court has supplemental jurisdiction over the remaining common law and state claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(c) and because a substantial part of the events giving rise to Plaintiff's claims occurred in this jurisdiction.

GENERAL ALLEGATIONS

15.     This action is for damages brought on behalf of the Plaintiff who was prescribed and supplied with, received and who has taken and applied the prescription drugs AndroGel and Testim, (hereafter referred to as "testosterone medication") as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief, general and special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused by this drug.

16.     Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff s injuries and damages.

17.     At all times herein mentioned, the Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drug AndroGel for the use and application by Plaintiff.

18.     At all times herein mentioned, Defendants were authorized to do business within the state of Ohio, where Plaintiff resides.

19.     At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product, and thereby actively participated in the tortious conduct which resulted in the injuries

4

suffered by Plaintiff.

20.     Plaintiff files this lawsuit within the applicable limitations period of first suspecting Defendants' medication caused the appreciable harm sustained by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful cause of Plaintiff s injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when Plaintiff s injuries were discovered, their cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action.

21.     Additionally, Plaintiff was prevented from discovering this information sooner because Defendants misrepresented and continue to misrepresent to the public, and the medical community, that the drugs AndroGel and Testim are safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

OVERVIEW

22.     Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone.

23.     In 1999, when Unimed Pharmaceuticals Inc., one of the Defendants' predecessor companies, asked for FDA approval of AndroGel, it asserted that hypogonadism was estimated to affect approximately "one million American men."

24.     In 2000, when the FDA approved AndroGel, the company announced that the market was "four to five million American men." By 2003, the number increased to "up to 20 million men." However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in

Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

25.     Defendants coordinated a massive advertising campaign designed to convince men that they suffer from low testosterone. Defendants orchestrated a national disease awareness media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential AndroGel users, and online media including the unbranded website "IsitLowT.com."

26.     The television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of these "symptoms." These "symptoms" include listlessness, increased body fat, and moodiness-all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

27.     Defendants' national education campaign included the creation and continued operation of the website www.IsitLowT.com. The website asserts that millions of otherwise healthy men experience low testosterone and encourages male visitors to "Take the 'Is It Low T' Quiz." The 'Is It Low T' quiz asks men if they have experienced potential signs of low testosterone, including "Have you experienced a recent deterioration in your ability to play sports?"; "Are you falling asleep after dinner?"; "Are you sad and/or grumpy?"; and "Do you have a lack of energy?"

28.     Dr. John Morley, director of endocrinology and geriatrics at the St. Louis University School of Medicine, developed this quiz at the behest of Dutch pharmaceutical company Organon BioSciences, in exchange for a $40,000 grant to his university.  The pharmaceutical company instructed Dr. Morley, "Don't make it too long and make it somewhat sexy."  Dr. Morely drafted the questionnaire in 20 minutes in the bathroom, scribbling the questions on toilet paper and giving them to his secretary the next day to type.  Dr. Morely admits that he has "no trouble calling it a crappy questionnaire" and that it is "not ideal."  This is the 'Low T Quiz' used on the "IsitLowT" website.  Natasha Singer, *Selling that New-Man Feeling,* Nov. 23, 2013, N.Y. Times.

29.     Since the FDA approved AndroGel, Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

30.     While running its disease awareness campaign, Defendants promote their product AndroGel as an easy to use, topical testosterone replacement therapy. Defendants contrast their product's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

31.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease.  Although prescription testosterone replacement therapy has been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

32.     What consumers received, however, were not safe drugs, but a product which causes life-threatening problems, including strokes, heart attacks and the development of deep vein thrombosis and pulmonary embolism.

33.     Defendants successfully created a robust and previously nonexistent market for their drug. Defendant Abbott Laboratories spent $80 million promoting AndroGel in 2012. The company also spent millions on its unbranded marketing including commercials and its websites, www.IsitLowT.com and www.DriveForFive.com, sites which recommend that men have regular checkups with their physicians and five regular tests done: including cholesterol, blood pressure, blood sugar, prostate-specific antigen, and testosterone.

34.     Defendants' advertising resulted in $1.4 billion in sales during the past year, making AndroGel the biggest selling Androgen drug in the United States. Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?,* May 10, 2012, Bloomberg Businessweek.

35.     In early 2013, Medical Marketing & Media named two AbbVie executives as "the all-star large pharma marketing team of the year" for promotions of AndroGel and unbranded efforts to advance low T. *See* Singer, *Selling That New-Man Feeling, supra;* See *also,* Larry Dobrow, *All-star large pharma marketing team of the year: Androgel.* Jan. 2, 2013, Medical Marketing & Media, *available at:* http://www.mmm·online.com/all-star-large-pharma·marketing-team-of-the-year-androgel/article/273242/.

36.     The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the use of AndroGel is safe for human use, even though Defendants knew these statements to be false, and even though Defendants had no reasonable grounds to believe them to be true.

37.     There have been a number of studies suggesting that testosterone use

in men increases the risk of heart attacks and strokes.

38.    In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

39.    In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels" which indicated that testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

40.    On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non·Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty-five years old and men younger than sixty-five with a previous diagnosis of heart disease.

### FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

41.    The Food and Drug Administration approved AndroGel 1% on February 28, 2000 for the treatment of adult males who have low or no testosterone (AndroGel 1.62% was approved in April, 201 I). After FDA approval, AndroGel was widely advertised and marketed by Defendants as a safe and effective means of testosterone replacement therapy.

42.    The Food and Drug Administration approved Testim on October 31, 2002 for the treatment of adult males who have low or no testosterone. After FDA approval Testim was widely advertised and marketed by Auxilium Pharmaceuticals, Inc. as a safe and effective testosterone replacement therapy.

43.    AndroGel is a hydroalcoholic gel containing testosterone in either 1% or 1.62%, is applied to the chest, arms or stomach and enters the body through transdermal absorption. The AndroGel 1.62% product also contains isopropyl

myristate as an ointment and ethanol for absorption enhancement.

44.     Testim is also a hyroalcoholic gel containing testosterone that is applied to the shoulders or upper arms.

45.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

46.     The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

47.     In men, testosterone levels normally begin a gradual decline after the age of thirty.

48.     The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood.  However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

49.     Testosterone products may produce undesirable side effects to patients who use the drug, including but not limited to, myocardial infarction, stroke, deep vein thrombosis, pulmonary embolism and death.

50.     In some patient populations, AndroGel use may increase the incidence of myocardial infarctions and death by over 500%.

51.     In addition to the above, testosterone products have been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied testosterone products. Patients taking testosterone products may experience enlarged prostrates and increased serum prostate-specific antigen levels.

52.     Secondary exposure to AndroGel or Testim can cause side effects in others. In 2009 the FDA issued a black box warning for testosterone products, advising patients of reported adverse events in children who were secondarily exposed to the gel. Testosterone products may also cause physical changes in women exposed to the drug and cause fetal damage in pregnant women who come into secondary contact with AndroGel or Testim.

53.     Defendants' marketing strategy beginning in 2000 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew, or should have known, would result from use of its products.

54.     Defendants successfully marketed AndroGel and Testim by undertaking a "disease awareness" marketing campaign. This campaign sought to create a consumer perception that low testosterone is prevalent amount U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low·T."

55.     Defendants' advertising program sought to create the image and belief by consumers and their physicians that the use of testosterone products, such as AndroGel and Testim, were a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false. The Defendants had no reasonable grounds to believe them to be true.

56.     Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using AndroGel and Testim. Defendants deceived potential AndroGel and Testim users by relaying positive information through the press, including testimonials from retired professional

11

athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

57.     Defendants concealed material relevant information from potential testosterone product users and minimized user and prescriber concern regarding the safety of AndroGel and Testim.

58.     In particular, in the warnings Defendants give in their commercials, online and print advertisements, Defendants fail to mention any potential cardiac or stroke side effects and falsely represents that Defendants adequately tested AndroGel and Testim for all likely side effects.

59.     As a result of Defendants' advertising and marketing, and representations about its product, men in the United States pervasively seek out prescriptions for AndroGel or Testim. If plaintiff had known the risks and dangers associated with AndroGel and Testim, Plaintiff would not have used AndroGel and Testim and consequently would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

60.     Plaintiff, was approximately 58 years of age when he was prescribed and used AndroGel and Testim for symptoms he attributed to low testosterone.

61.     The AndroGel and Testim he used caused physical and emotional impairment, which affected his personal and professional life. These impairments included, but were not limited to the development of a stroke.

62.     Prior to using AndroGel and Testim, Plaintiff had no history of stroke, bleeding or clotting disorders.

## CAUSES OF ACTION

### COUNT I
### STRICT PRODUCTS LIABILITY - MANUFACTURING DEFECT

63.     Plaintiff incorporates each paragraph of this Complaint as if set forth fully here, and further alleges as follows.

64.    Testosterone products were designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

65.    When it left the control of Defendants, the testosterone products AndroGel and Testim were expected to, and did reach Plaintiff without substantial change from the condition in which it left Defendants' control.

66.    Both AndroGel and Testim were defective when the products left Defendants' control and was placed in the stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specification and/or applicable federal requirements, and posed a risk of serious injury and death.

67.    Specifically, AndroGel and Testim were more likely to cause heart attacks, strokes, the development of deep vein thrombosis and/or pulmonary embolism, and death than other similar medications.

68.    Plaintiff used both AndroGel and Testim in substantially the same condition it was in when it left control of Defendants and any changes or modifications were foreseeable by Defendants.

69.    Plaintiff and his healthcare providers did not misuse or materially alter the AndroGel or Testim.

70.    As a direct and proximate result of the Plaintiff s use of AndroGel and Testim, he suffered serious physical injury, harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

71.    Defendants are strictly liable to Plaintiff for designing, creating, manufacturing, distributing, selling, and placing AndroGel and Testim into the stream of commerce, and for all damages caused to Plaintiff by his use of AndroGel and Testim because the product was defective.

72.    Defendants' actions and omissions as alleged in this Complaint

13

constitute a flagrant disregard for human life, so as to warrant the imposition of

punitive damages.

WHEREFORE, Plaintiff respectfully requests an award of compensatory and

punitive damages, in addition to all costs, interest and fees, including attorneys'

fees, to which he is entitled under law and such other relief as this Honorable Court

deems appropriate.

## COUNT II
## STRICT PRODUCTS LIABILITY - DESIGN DEFECT

73.    Plaintiff incorporates each paragraph of this Complaint as if set forth

fully here, and further alleges as follows.

74.    The testosterone products were not merchantable and/or reasonably

suited to the use intended, and its condition when sold was the proximate cause of

the injuries sustained by Plaintiff.

75.    Defendants placed the testosterone products into the stream of commerce

with wanton and reckless disregard for the public safety.

76.    Both testosterone products AndroGel and Testim were defective in

design in that, when it left Defendants' control, the foreseeable risks of the product

exceeded the benefits associated with its design, and it was more dangerous than an

ordinary consumer or ordinary healthcare provider would expect.

77.    The foreseeable risks associated with the testosterone product,

AndroGel and Testim's design include the fact that its design is more dangerous

than a reasonably prudent consumer or healthcare provider would expect when

used in an intended or reasonably foreseeable manner.

78.    The testosterone products was in an unsafe, defective, and

inherently dangerous condition, which was unreasonably dangerous to its

users and in particular, Plaintiff.

14

79.   AndroGel and Testim were in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that the testosterone products were defective and unsafe, even when used as instructed.

80.   The nature and magnitude of the risk of harm associated with the design of AndroGel and Testim, including the risk of suffering a heart attack, stroke, developing a deep vein thrombosis and pulmonary embolism, and death, is high in light of the intended and reasonably foreseeable use of AndroGel and Testim.

81.   The risks of harm associated with the design of AndroGel and Testim are higher than necessary.

82.   It is highly unlikely that AndroGel or Testim users would be aware of the risks associated with AndroGel and Testim through either warnings, general knowledge or otherwise, and Plaintiff specifically was not aware of these risks.

83.   The design did not conform to any applicable public or private product standard that was in effect when AndroGel and Testim left the Defendants' control.

84.   The design of Androgel and Testim is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner as a reversible form of contraceptive. It was more dangerous than Plaintiff expected.

85.   The intended or actual utility of AndroGel or Testim is not of such benefit or to justify the risk of heart attack, stroke, deep vein thrombosis, pulmonary embolism and/or death.

86.   At the time AndroGel and Testim left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause heart attack, stroke, deep vein thrombosis, pulmonary embolism and/or death

or an alternative design that would have substantially reduced the risk of these

injuries.

87.    It was both technically and economically feasible to provide a safer

alternative product that would have prevented the harm suffered by Plaintiff.

88.    The unreasonably dangerous nature of AndroGel and Testim caused

serious harm to Plaintiff.

89.    As a direct and proximate result of the Plaintiff s use of the AndroGel

and Testim, which was designed, manufactured, marketed, promoted, sold, and

introduced into the stream of commerce by Defendants, Plaintiff suffered serious

physical injury, harm, damages and economic loss and will continue to suffer such

harm, damages and economic loss in the future.

WHEREFORE, Plaintiff respectfully requests an award of compensatory and

punitive damages, in addition to all costs, interest and fees, including attorneys' fees,

to which he is entitled under law and such other relief as this Honorable Court deems

appropriate.

COUNT III
STRICT PRODUCTS LIABILITY - FAILURE TO WARN

90.    Plaintiff incorporates each paragraph of this Complaint as if set forth

fully here, and further alleges as follows.

91.    Defendants had a duty to warn Plaintiff and his healthcare providers

of the risk of heart attack, stroke, deep vein thrombosis, pulmonary embolism

and/or death associated with AndroGel and Testim.

92.    Defendants knew, or in the exercise or reasonable care should have

known, about the risk of heart attack, stroke, deep vein thrombosis, pulmonary

embolism and/or death.

93.    Defendants failed to provide warnings or instructions that a

16

manufacturer exercising reasonable care would have provided concerning the risk of heart attack, stroke, deep vein thrombosis, pulmonary embolism and/or death, in light of the likelihood that its product would cause these injuries.

94.    Defendants failed to update warnings based on information received from product surveillance after AndroGel and Testim were first approved by the FDA and marketed, sold, and used in the United States and throughout the world.

95.    A manufacturer exercising reasonable care would have updated its warnings on the basis of reports of injuries to men using AndroGel a n d T e s t i m  after FDA approval.

96.    When it left Defendants' control, AndroGel and Testim were defective and unreasonably dangerous for failing to warn of the risk of heart attack, stroke, deep vein thrombosis, pulmonary embolism and/or death.

97.    Plaintiff used both AndroGel and Testim for its approved purpose and in a manner normally intended and reasonably foreseeable by the Defendants.

98.    Plaintiff and Plaintiff s healthcare providers could not, by the exercise of reasonable care, have discovered the defects or perceived their danger because the risks were not open or obvious.

99.    Defendants, as the manufacturers and distributors of AndroGel and Testim, are held to the level of knowledge of an expert in the field.

100.    The warnings that were given by Defendants were not accurate or clear, and were false and ambiguous.

101.    The warnings that were given by the Defendants failed to properly warn physicians of the risks associated with AndroGel and Testim, subjecting Plaintiff to risks that exceeded the benefits to the Plaintiff.  Plaintiff, individually and through

his physician, reasonably relied upon the skill, superior knowledge and judgment of

the Defendants.

102. Defendants had a continuing duty to warn Plaintiff and his prescriber of

the dangers associated with its product.

103. Had Plaintiff or his healthcare providers received adequate warnings

regarding the risks associated with the use of the AndroGel and Testim, he would

not have used it.

104. As a direct and proximate result of the Plaintiff s use of AndroGel and

Testim and Plaintiff s reliance on Defendants' representations regarding the

character and quality of the product and Defendants' failure to comply with federal

requirements, Plaintiff suffered serious physical injury, harm, damages and economic

loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff respectfully requests an award of compensatory and

punitive damages, in addition to all costs, interest and fees, including attorneys' fees,

to which he is entitled under law and such other relief as this Honorable Court deems

appropriate.

## COUNT IV
## NEGLIGENCE

105. Plaintiff incorporates each paragraph of this Complaint as if set forth

fully here, and further alleges as follows.

106. Defendants had a duty to exercise reasonable and ordinary care in the

design, manufacture, sale, testing, quality assurance, quality control, labeling,

marketing, promotions, and distribution of AndroGel and Testim into the stream of

commerce, including a duty to assure that its product did not pose an undue risk of

bodily harm and adverse events, and to properly warn of all risks, and comply with

federal requirements.

107.  Defendants failed to exercise reasonable and ordinary care in the design, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions and distribution of AndroGel and Testim into the stream of commerce in that Defendants knew or should have known that the product caused significant bodily harm and was not safe for use by consumers.  Specifically, Defendants failed to properly and thoroughly:

a.    Test AndroGel and Testim before releasing it into the market;

b.    Analyze the data resulting from the pre-marketing tests of AndroGel and Testim;

c.    Conduct sufficient post-market testing and surveillance of AndroGel and Testim;  and

d.    Provide appropriate warnings for consumers and healthcare providers including disclosure of the known or potential risks or true or suspected rates of heart attack, stroke, deep vein thrombosis, pulmonary embolism and/or death.

108.  Despite the fact that Defendants knew or should have known that their product posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market AndroGel and Testim for use by consumers and continued to fail to comply with federal requirements.

109.  Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

110.  It was foreseeable that Defendants' product, as designed, would cause serious injury to consumers, including Plaintiff.

111.  As a direct and proximate result of Defendants' negligence, Plaintiff

suffered serious physical injury, harm, damages and economic loss and will

continue to suffer such harm, damages and economic loss in the future.

112. Defendants' conduct as described above, including but not limited to

their failure to adequately design, test, and manufacture, as well as its continued

marketing and distribution of the AndroGel and Testim when they knew or should

have known of the serious health risks it created and the failure to comply with

federal requirements, evidences a flagrant disregard of human life so as to warrant

the imposition of punitive damages.

113. Defendants' actions and omissions as alleged in this Complaint

demonstrate a flagrant disregard for human life, and willful and wanton conduct,

which warrants the imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests an award of compensatory and

punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to

which he is entitled under law and such other relief as this Honorable Court deems

appropriate.

## COUNT V
## BREACH OF EXPRESS WARRANTY

114. Plaintiff incorporates each paragraph of this Complaint as if set forth

fully here, and further alleges as follows.

115. Defendants expressly warranted that AndroGel and Testim were

a safe and effective product for the treatment of low testosterone, and did not

disclose the material risks that AndroGel or Testim could cause heart attacks,

strokes, deep vein thrombosis, pulmonary embolism and/or death.

116. The representations were not justified by the performance of

AndroGel and Testim.

117. Members of the consuming public, including consumers such as

Plaintiff, and his healthcare providers, were intended third party beneficiaries of the warranty.

118.  Plaintiff and his healthcare providers reasonably relied on these express representations.

119.  The AndroGel and Testim manufactured and sold by Defendants did not conform to these express representations because it caused serious injury to the Plaintiff when used as recommended and directed, and these risks were not disclosed to Plaintiff or his healthcare providers.

120.  As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff respectfully requests an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which he is entitled under law and such other relief as this Honorable Court deems appropriate.

## COUNT VI
## BREACH OF IMPLIED WARRANTY

121.  Plaintiff incorporates each paragraph of this Complaint as if set forth fully here, and further alleges as follows.

122.  When Defendants designed, manufactured, marketed, sold, and distributed their AndroGel and Testim for use by the Plaintiff, Defendants knew of the use for which it was intended and impliedly warranted the product to be of merchantable quality and safe for such use and that its design, manufacture, labeling, and marketing complied with all applicable federal requirements.

123.  Plaintiff and his physicians reasonably relied upon the Defendants' representations of the product's merchantable quality and that it was safe for its

intended use, and upon Defendants' implied warranty, including that it was in compliance with all federal requirements.

124.   Contrary to such implied warranty, both AndroGel and Testim were not of merchantable quality or safe for its intended use, because the product was defective, as described herein, and it failed to comply with federal requirements.

125.   As a direct and proximate result of Defendants' breach of warranty, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

WHEREFORE, Plaintiff respectfully requests an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which he is entitled under law and such other relief as this Honorable Court deems appropriate.

## COUNT VII
## FRAUD

126.   Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though set forth fully herein.

127.   Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed AndroGel and Testim, and up to the present, willfully deceived Plaintiff by concealing from him, his physicians and the general public, the true facts concerning AndroGel and Testim, which the Defendants had a duty to disclose.

128.   At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of AndroGel and Testim and willfully deceived Plaintiff, Plaintiff s physicians and the general public as to the benefits, health risks and consequences of using AndroGel and Testim.  Defendants knew of the foregoing, that AndroGel and Testim are not safe, fit and effective for human

22

consumption, that using AndroGel or Testim is hazardous to health, and that

AndroGel and Testim have a serious propensity to cause serious injuries to its users,

including but not limited to the injuries Plaintiff suffered.

129.   Defendants concealed and suppressed the true facts concerning

AndroGel and Testim with the intent to defraud Plaintiff, in that Defendants

knew that Plaintiff physicians would not prescribe AndroGel or Testim, and

Plaintiff would not have used AndroGel or Testim, if they were aware of the

true facts concerning its dangers.

130.   As a result of Defendants' fraudulent and deceitful conduct, Plaintiff

suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiff respectfully requests an award of compensatory and

punitive damages, in addition to all costs, interest and fees, including attorneys' fees,

to which he is entitled under law and such other relief as this Honorable Court deems

appropriate.

## COUNT VIII
## NEGLIGENT MISREPRESENTATION

131.   Plaintiff incorporates by reference herein each of the allegations set

forth in this Complaint as though fully set forth herein.

132.   From the time AndroGel and Testim were first tested, studied,

researched, evaluated, endorsed, manufactured, marketed and distributed, and up to

the present, Defendants made misrepresentations to Plaintiff, Plaintiff s physicians

and the general public, including but not limited to the misrepresentation that

AndroGel and Testim were safe, fit and effective for human use. At all times

mentioned, Defendants conducted a sales and marketing campaign to promote the sale

of AndroGel and Testim and willfully deceived Plaintiff, Plaintiff s physicians

and the general public as to the health risks and consequences of the use of AndroGel

and Testim.

133.   The Defendants made the foregoing representation without any reasonable ground for believing them to be true.  These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

134.   The representations by the Defendants were in fact false, in that both AndroGel and Testim are not safe, fit and effective for human consumption and is hazardous to health.

135.   The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of AndroGel and Testim.

136.   In reliance of the misrepresentations by the Defendants, and each of them, Plaintiff was induced to purchase and use AndroGel and Testim.  If Plaintiff had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used AndroGel or Testim.  The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

137.   As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

WHEREFORE, Plaintiff respectfully requests an award of compensatory and punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which he is entitled under law and such other relief as this Honorable Court deems appropriate.

<u>PUNITIVE  DAMAGES  ALLEGATIONS</u>

138.    Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though fully set forth herein.

139.    The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious.  Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other AndroGel a n d T e s t i m  users and for the primary purpose of increasing Defendants' profits from the sale and distribution of AndroGel and Testim.  Defendants' outrageous and un-conscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

140.    Prior to the manufacturing, sale, and distribution of AndroGel and Testim, Defendants knew that the testosterone products were in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using the testosterone products.

141.    Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in AndroGel and Testim and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in the testosterone products.  Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of AndroGel and Testim knowing these actions would

expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

142.   Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

WHEREFORE, Plaintiff respectfully requests an award of punitive damages, in addition to all costs, interest and fees, including attorneys' fees, to which he is entitled under law and such other relief as this Honorable Court deems appropriate.

## PRAYER FOR RELIEF

Plaintiff respectfully requests judgment against Defendants on each of the above counts as follows:

a.   Compensatory damages to Plaintiff for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries, healthcare costs, medical monitoring, together with all interest and costs as provided by the law;

b.   Punitive and exemplary damages for the wanton, willful, fraudulent, and reckless acts of Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and Plaintiff, in an amount sufficient to punish Defendants and deter future similar conduct;

c.   Plaintiff s attorney fees;

d.   Plaintiff s costs of the proceedings; and

e.       Such other and further relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL


The Plaintiff hereby demands a trial by jury on all counts and as to all issues.

Respectfully submitted this 30 September 2014.

James Esparza Law Firm


*/s/ James Esparza*
James Esparza, ILSB #6282248
299 South Main, 13th Floor
Salt Lake City, Utah 84111
Tel. 801.272.9100
Email: james@jamesesparza.com